**David SCHOFIELD, Appellant,**

v.

**CITY OF ST. PAUL, Appellee.**

**No. S–13461.**

Supreme Court of Alaska.

Sept. 3, 2010.

---

Mary A. Gilson and Allison E. Mendel, Mendel & Associates, Anchorage, for Appellant.

Gregory R. Henrikson, Walker & Eakes, Anchorage, for Appellee.

Before: CARPENETI, Chief Justice, FABE, WINFREE, and CHRISTEN, Justices.

*OPINION*

CARPENETI, Chief Justice.

## I. INTRODUCTION

A police officer's allegedly improper marriage to a woman in the Philippines aroused the ire of the municipal police chief. Amidst

the ensuing controversy, the officer resigned, purportedly to protect his police certification. He then brought suit claiming constructive discharge. However, the jury found that the officer was not constructively discharged. The officer appeals, arguing that the superior court erred in its wording of a jury instruction, in several evidentiary rulings, and in awarding attorney's fees. Because we conclude that one of the evidentiary rulings was erroneous, we remand the case to the superior court, and do not reach the remaining issues.

## II. FACTS AND PROCEEDINGS

### A. Facts

David Schofield was a police officer in St. Paul, Alaska, from October 1998 until his resignation in late October 2004. He had moved to St. Paul in 1996, although his then-wife remained in Idaho. In December 2003 Schofield was introduced via the internet to Eula Figuero a woman living in the Philippines. Schofield traveled to the Philippines in July 2004 and proposed to Figuero; a wedding was scheduled for October 8, 2004.

Schofield sent divorce papers to his wife in Idaho, but the divorce was not finalized when Schofield traveled to the Philippines for his wedding. Therefore, Schofield claims he and Figuero completed a "non-legal" wedding ceremony, and were not "actually" married. But, according to the City of St. Paul, Schofield told city officials he was married to Figuero. Schofield's father, who said he attended the ceremony, also said that Schofield had married.

Within weeks of the wedding, St. Paul Chief of Police Gary Putman became aware of the apparent double marriage, which he believed constituted the crime of "Unlawful Marrying" under AS 11.51.140. At this time, Chief Putman was also looking into Schofield's absence from work, because Schofield was due back by October 13 but had not been heard from as of October 18.

Upon Schofield's arrival back in Alaska, two important meetings between Putman and Schofield ensued. First, upon Schofield's return on Friday, October 22 from the Philippines, he was met at the airport by a police officer and taken immediately to meet with Putman. Putman taped his meeting with Schofield, with Schofield's consent. At this meeting, Putman confronted Schofield about his allegedly criminal activity, and told Schofield that the issue could cost Schofield his police certification. Putman suspended Schofield and scheduled a follow-up meeting for Monday afternoon, October 25.

Schofield testified that over the weekend St. Paul residents told him he had been terminated. Schofield also testified that on Monday morning he had a conversation with Mike Meehan, acting director of the Alaska Police Standards Council. From that conversation Schofield was left with the impression that he would lose his police certification if he were fired, but not if he resigned. Meehan acknowledged that he had a conversation with Schofield, but implied that he would not have told Schofield this.[1]

The second meeting between Schofield and Putman was on Monday afternoon; it too was recorded. Even before entering the meeting, Schofield was aware that his office had been packed up and cleaned out. At the meeting, Schofield asked what alternatives he had to resigning, and in response Putman stated that the district attorney would look into whether to prosecute Schofield and the Alaska Police Standards Council would question Schofield's police certification. Putman then told Schofield that he could "expect probably some fairly aggressive questioning" and could "pretty much figure out the direction this is going to take." Schofield claims that because he feared he would be fired, he resigned at that meeting to protect his certification.

### B. Proceedings

In October 2006 Schofield filed a complaint in superior court. He alleged wrongful termination and constructive discharge, and asked for damages in excess of $100,000.00.

1. When informed of Schofield's version of Meehan's remarks, Meehan testified that "it doesn't sound like something I would say."

Superior Court Judge Craig F. Stowers conducted a civil jury trial. At trial Schofield argued that the factors surrounding his return from the Philippines made him feel like he was going to be fired, and therefore his resignation to protect his police certification was constructively a discharge. In January 2009 the jury returned a special verdict finding that there was no constructive discharge. Constructive discharge was the first issue on the special verdict form, and the jury did not reach any other issues.

Because the city made an earlier offer of judgment (offering $10,000 costs, attorney's fees, and judgment in favor of Schofield), the court awarded the city attorney's fees under Civil Rule 68 in the amount of $72,362.75.

Schofield appeals, alleging ten errors: He challenges the jury instruction on constructive discharge, six evidentiary exclusions, two evidentiary inclusions, and the attorney's fees award. Because we conclude that one of the evidentiary exclusions requires reversal, we reach the merits of that issue only.

### III. STANDARD OF REVIEW

 We review a trial court's admission or exclusion of evidence for abuse of discretion.[2] "An abuse of discretion exists only when we are left with a definite and firm

2. *Getchell v. Lodge*, 65 P.3d 50, 53 (Alaska 2003).

3. *Id.* (internal citations omitted).

4. *Noffke v. Perez*, 178 P.3d 1141, 1148 (Alaska 2008) (quoting *Dalkovski v. Glad*, 774 P.2d 202, 207 (Alaska 1989)).

5. The relevant portions of the October 22 meeting, with excluded segments bracketed and in italics, follow:
 MR. PUTMAN: Yeah. But I mean I'll tell you I'm really concerned about where you're at on [the marriage] issue. That's why I asked you, did you do this by the book?
 MR. SCHOFIELD: No, but by the same ...
 MR. PUTMAN: And when you're in a foreign country, boy, I'll tell you that I—I would suspect that would always want to do things according to their laws because nobody wants to end up in one of their institutions.
 MR. SCHOFIELD: Well, I spoke to a judge before doing this.
 MR. PUTMAN: Huh?
 MR. SCHOFIELD: I spoke to a judge right before doing this.
 MR. PUTMAN: Do you have the judge's name?

conviction, after reviewing the whole record, that the trial court erred in its ruling."[3] Further, we will reverse only if the error was prejudicial, that is "whether on the whole record the error would have had a substantial influence on the verdict of a jury of reasonable laymen."[4]

### IV. DISCUSSION

**A. It Was Error To Exclude Chief Putman's Statements About The District Attorney And The Alaska Police Standards Council.**

At trial Schofield wanted to introduce several statements which he claims would show that he had reason to believe he would be fired. But the superior court excluded several of the statements as unfairly prejudicial and confusing or irrelevant. We address here the superior court's decision to exclude portions of the two taped conversations between Schofield and Putman.

The superior court excluded substantial portions of Putman's October 22 and 25 meetings with Schofield. The superior court excluded the portion of the October 22 meeting where Putman said he spoke with the district attorney, would refer Schofield's record to the district attorney, and expected charges to be brought against Schofield.[5]

MR. SCHOFIELD: I can get the name, yes.
MR. PUTMAN: Yeah. If—if you can get the name and you can show me all this stuff ...
MR. SCHOFIELD: Okay.
MR. PUTMAN: ... then I'll certainly make it part of the record. [*And that will go-I spoke with the attorney that handles policemen's conduct in Anchorage.*
MR. SCHOFIELD: Okay.
MR. PUTMAN: His name is Kevin Burke ...
MR. SCHOFIELD: Uh-huh.
MR. PUTMAN: ... what I found. Now, what he chooses to do with it at that point, I personally do not anticipate that this state, if they're going to—I could be wrong, but they're—they will anticipate pressing charges against you.
MR. SCHOFIELD: Okay.
MR. PUTMAN: but I can't say what they'll do in Idaho. And if you didn't do something by according to Hoyle ...
MR. SCHOFIELD: Hoyle?
MR. PUTMAN: ... so to speak. Well, that's like you play cards, it's a book of Hoyle—or the rules. Now, if you didn't do things the way they were supposed to be done ...
MR. SCHOFIELD: Uh-huh.*]

The superior court then excluded a larger portion of the October 25 conversation where Putman again said the district attorney would get Schofield's record and would decide whether to prosecute or investigate further. The court also struck Putman's statement that the Police Standards Council would subpoena the records and would probably do "some fairly aggressive questioning ... relative to [Schofield's] certification." Arguably insinuating that Schofield's certification would be revoked, Putman said: "So you can pretty much figure out the direction this is going to take."[6]

### 1. Whether the exclusions were an abuse of discretion

■ The city asserts that the exclusions were appropriate and were based on an earlier ruling on a motion in limine. In that ruling, the superior court excluded all information about the district attorney's investigation and the Police Standards Council's investigation. The court found those investigations irrelevant, or if marginally relevant, then too potentially misleading. The court reasoned that whether the district attorney or the Police Standards Council ultimately took action was irrelevant to Schofield's decision to resign, since those agencies' investigations were discretionary and would come after Schofield's decision to resign. Schofield, however, argues this was an abuse of discretion because Putman's comments, coming right before Schofield's resignation, were highly relevant to the issue of whether he felt forced to resign and unlikely to mislead since they did not actually contain information

MR. PUTMAN: ... and if you deceived them, forged any documents, falsified any documents, did anything like that, you could be in some serious trouble.

6. The relevant portions of the October 25 meeting, with excluded segments bracketed and in italics, follow:

MR. PUTMAN: So you're saying that you're resigning?
MR. SCHOFIELD: Not something I'd like to do, but I think that may be the best course of action right now.
MR. PUTMAN: The only thing I can tell you, if you choose to resign, I will accept it.
MR. SCHOFIELD: Okay.
MR. PUTMAN: But the thing is, is I have to have that decision today within the next hour.
MR. SCHOFIELD: Okay.
MR. PUTMAN: And the only thing I can tell you should you choose to resign that I wish you the best. I'll even do what I can to help you if—if it's within my capability as an individual, also it must be within my capabilities professionally.
MR. SCHOFIELD: Yes.
MR. PUTMAN: And I hope you understand that.
MR. SCHOFIELD: Of course I do.
MR. PUTMAN: And I want to see you get your life back in order, too. I know that this certainly hasn't been pleasant for any of us.
MR. SCHOFIELD: No, I understand that.
MR. PUTMAN: Okay. You need a few minutes then?
MR. SCHOFIELD: Are there any other options that are really open to me on this?
MR. PUTMAN: The options are always open to you, David. [*I can tell you—I can tell you what is going to happen ...*
MR. SCHOFIELD: *Okay.*

MR. PUTMAN: *... from this—from this point. I've been in touch, as I told you before, with Kevin Burke with the district attorney's office.*
MR. SCHOFIELD: *All right.*
MR. PUTMAN: *He is the—the district attorney that handles all officer misconduct.*
MR. SCHOFIELD: *Correct.*
MR. PUTMAN: *All right. He will get my report. He will make a decision what to do with that.*
MR. SCHOFIELD: *Okay.*
MR. PUTMAN: *Whether to prosecute it, whether to send it to another state for prosecution, whether to assign it to other people within the state for additional investigation. The one thing that will happen when they're per—perform this process, you're—this record and everything that's been done will be subpoenaed. And I know this because I got a phone call today, will be subpoenaed by APSC.*
MR. SCHOFIELD: *Okay.*
MR. PUTMAN: *And you, of course, will have an opportunity to answer any questions that they have in regard to it.*
MR. SCHOFIELD: *Okay.*
MR. PUTMAN: *But they're not governed by the same rules that you might expect in court, so ...*
MR. SCHOFIELD: *Right, I understand.*
MR. PUTMAN: *... you—I mean, expect probably some fairly aggressive questioning ...*
MR. SCHOFIELD: *Okay.*
MR. PUTMAN: *... relative to your certification.*
MR. SCHOFIELD: *Okay.*
MR. PUTMAN: *So you can pretty much figure out [the] direction this is going to take.*
MR. SCHOFIELD: *Right.*
MR. PUTMAN: *So the decision is yours.*
MR. SCHOFIELD: *Okay.*]
MR. PUTMAN: Do you know what you wish to do?

about the district attorney's and the Police Standards Council's investigations.

■ Alaska Evidence Rule 403 governs such exclusions: "Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Trial courts have broad discretion in applying this balancing test.[7]

Generally it makes sense to exclude information concerning the *results* of any investigation by the district attorney or the Police Standards Council because those investigations would have occurred after, and independent of, Schofield's decision to resign— i.e., they could not have compelled him to resign and are thus irrelevant. But that logic is not germane to the statements that were excluded in this case. Here, many of the excluded statements were uttered right before Schofield resigned and do not pertain to the results of the investigations, just the threat of an investigation.

Further, the statements were relevant and presented little danger of unfair prejudice or potential to mislead. Because Schofield claimed he resigned to avoid a potentially career-ending investigation, it was relevant that Putman insinuated to Schofield that Schofield's record would be sent to the district attorney and the Police Standards Council, and that those agencies would likely undertake investigations if Schofield did not tender his resignation. This is particularly true because the excluded portions of the October 25 conversation came directly before Schofield tendered his resignation to Putman. And the statements' relevance is not outweighed by their potential to mislead. It is true that the ultimate results of the investigations could mislead the jury because the agencies might use different records and processes than a court uses. But the statements in question would not require any discussion of the results of the investigations by the

district attorney or the Police Standards Council. Rather, they simply show that Schofield was threatened by, or made aware of, their potential.

Because the excluded statements go to the core of Schofield's claim that he resigned to protect his police certification, there is significant probative value to the statements. And because the statements do not discuss the ultimate outcome of the investigations of the district attorney's or the Police Standards Council's investigations, the possibility of confusion from their admission into evidence is minimal. We conclude that it was an abuse of discretion to exclude the statements.

## 2. Whether the error in excluding the evidence was prejudicial

■■ To reverse a trial court's evidentiary ruling, the error must affect the outcome, that is, "have had a substantial influence on the verdict. . . ."[8] We have found an erroneous exclusion of evidence to be reversible where it concerned an issue central to the case and "could have affected" the ultimate award.[9] That is the case here.

The excluded statements are central to Schofield's theory that he resigned to protect his certification. The gist of the excluded statements from October 25 is that if Schofield refused to resign (1) Putman would send his records to the district attorney and the Police Standards Council, (2) Putman expected the district attorney to prosecute, and (3) Putman insinuated that the Police Standards Council would revoke Schofield's certification. Schofield's theory was that he was constructively discharged by Putman's statements indicating Schofield's police certification could be revoked, which statements were largely contained in the excluded evidence. So it was quite important that the jury knew that Putman discussed with Schofield the district attorney's and the Police Standard Council's potential investigations, and in an allegedly threatening manner. Indeed, it was of particular importance because the constructive discharge instruction (instruc-

---

7. *Bluel v. State,* 153 P.3d 982, 986 (Alaska 2007).

8. *Noffke,* 178 P.3d at 1148 (quoting *Dalkovski,* 774 P.2d at 207).

9. *Id.*

tion number 21) required the jury to determine if Putman told Schofield that he had to resign or else be fired.[10]

While Putman never explicitly said that the investigations would proceed differently if Schofield resigned, Schofield was entitled to argue that Putman insinuated that based on context. In the excluded material, Schofield asked what alternatives he had to resignation, and in response Putman discussed the investigations that could affect Schofield's certification. In this context, the alternative to resigning was the loss of certification resulting from the district attorney's and the Police Standards Council's investigation. But the jury had no idea of those statements or their context. Instead, the jury heard Schofield ask if there were any options to resignation and heard Putman say yes. The jury did not hear the discussion about investigations and certification revocation, or the statement "you can pretty much figure out the direction this is going to take." This omission is significant because Schofield's theory is that he resigned under pressure, in order to avoid investigations that could lead to revocation of his certification.

Finally, the excluded statements were not the only evidence that resignation would avoid an investigation, but rather they served to corroborate a key assertion in the case: Schofield's contention that the Police Standards Council's representative Meehan said Schofield could avoid losing his certification if he resigned. The excluded conversation between Schofield and Putman came shortly after the alleged Meehan statement, which is otherwise uncorroborated.

Viewing the conversations between Putman and Schofield in their entirety—including the portion omitted from the jurors—it would be reasonable for a jury to conclude that Putman was encouraging Schofield to resign, with the insinuated threat that Schofield would end up being fired and lose his certification if he did not resign. On the other hand, viewing the conversations as the jury did—with the comments about potential investigations excised—the conversation appears relatively benign. Because the excluded statements related to constructive discharge (the ultimate matter which decided the case), came at a crucial moment, and corroborated a key statement, we conclude that their exclusion could have had a substantial influence on the verdict, and was sufficiently prejudicial to constitute reversible error.

**B. In Light Of The Decision Above, We Do Not Reach The Additional Points On Appeal.**

Because the superior court's award of attorney's fees was based on the city's status as prevailing party, and because our decision today remands the case to the trial court, we do not reach the merits of Schofield's attorney's fees claim.

Further, we express no opinion on the other evidentiary errors Schofield alleges. Because it is unknown what specific evidence will be introduced on remand and what objections might be raised, we leave the determination of those eventual issues to the discretion of the superior court.

Finally, our decision today should not be read as an implicit approval of the jury instruction contested in this appeal. Jury Instruction 21 concerned constructive discharge and Schofield alleges that it presented an erroneous theory of constructive discharge that would require the employer to explicitly propose a resignation and threaten a termination. While we have found "resign or be fired" threats to constitute constructive discharge,[11] we have also found constructive discharge in situations where no such explicit threats existed.[12] However, because it is not clear that Schofield objected to the jury instruction below, our review likely would be only for plain error.[13] That review is unnecessary in light of our decision to remand on

---

**10.** *See infra* Part IV.B.

**11.** *Municipality of Anchorage v. Gregg,* 101 P.3d 181, 192 (Alaska 2004).

**12.** *City of Fairbanks v. Rice,* 20 P.3d 1097, 1102–03 (Alaska 2000).

**13.** *Sowinski v. Walker,* 198 P.3d 1134, 1160 (Alaska 2008) (citing *Cummins, Inc. v. Nelson,* 115 P.3d 536, 541 (Alaska 2005)).

other grounds, and therefore we do not address Jury Instruction 21.

## V. CONCLUSION

Because it was error to exclude Putman's comments regarding expected investigations by the district attorney and the Police Standards Council from the October 22 and 25, 2004, taped meetings, we REVERSE the judgment below and REMAND this case to the superior court for proceedings consistent with this opinion.

STOWERS, Justice, not participating.